UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,                          Case No. 13-20653

v.                                    Hon. Matthew F. Leitman

JOSHUA ELISHA-DUWANE WHITE,

      Defendant.

_____/

## GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE (R. 39)

In 2013, Joshua White assaulted his girlfriend and showed her his gun. When she called police, he fled from her home and tried to hide his gun and drugs in a garbage can. Police responded, and found the stolen firearm and marijuana packaged for sale in Ann Arbor's Pilgrim Park. Months later, White was arrested again, this time with additional controlled substances: crack cocaine and marijuana. He entered a guilty plea to felon in possession of a firearm and possession with intent to distribute cocaine base. His lengthy criminal history resulted in a guideline range of 151 to 188 months; in 2014, Judge Battani imposed a 120 month sentence.

White now moves for compassionate release under 18 U.S.C. § 3582(c)(1)(A), citing the impact of the Covid-19 pandemic on the prison population at Milan FCI. He points to a recent diagnosis of hypertension to support his claim that he is at risk from Covid-19 complications. But he is receiving medication for high blood pressure, and the infection rate at Milan is quickly decreasing. White's motion should be denied.

*First*, since January 2020, the Bureau of Prisons has been preparing for Covid-19, implementing strict precautions to minimize the virus's spread in its facilities. Following two recent directives from the Attorney General, the Bureau of Prisons is also assessing its entire prison population to determine which inmates face the most risk from Covid-19, pose the least danger to public safety, and can safely be granted home confinement. This process necessarily requires the Bureau of Prisons to identify the best candidates for release, ensure that their homes are suitable for home confinement, and arrange a way to quarantine each of them for 14 days. As of May 7, 2020 these directives have resulted in at least 2,144 inmates being placed on home confinement. See BOP Covid-19 Website.

*Second*, White does not qualify for compassionate release. The Bureau of Prisons just received White's request for compassionate release on April 30, 2020, as required under 18 U.S.C. § 3582(c)(1)(A). The Bureau of Prisons

2

has not had a chance to evaluate White's request. Accordingly, the Court does not have jurisdiction to address White's Covid-19-based argument until he exhausts his administrative remedies. Nor, in any event, does White satisfy the statutorily mandated criteria for compassionate release. Because § 3582(c)(1)(A) requires that release be "consistent with" the Sentencing Commission's policy statements, White's failure to meet the criteria in USSG § 1B1.13 alone forecloses relief. Even when Covid-19 is taken into account, White's relatively young age and minor medical condition does not satisfy the requirements in § 1B1.13(1)(A) & cmt. n.1. White is receiving medication for his recently diagnosed hypertension, and medical scholars have concluded that common blood pressure medications do not increase the risk of Covid-19 complications. White's offense and criminal history also make him a danger to the community, see USSG § 1B1.13(2), because he has a long history of drug dealing and poor performance while on supervision. And the § 3553(a) factors—which the Court must also consider under § 3582(c)(1)(A)—likewise do not support release.

## Background

In January 2013, Joshua White's girlfriend called 911 to report a domestic violence assault in progress. White's girlfriend told the 911

operator that White, the father of her infant child, had just "pulled a gun" on her and punched her in the face before departing her home on foot. She also said that White was carrying a black and white backpack, and that she saw him place a black gun in his backpack. (PSR ¶ 9.)

Ann Arbor police officers responded and searched for White. In Pilgrim Park, officers saw Defendant on foot, and then saw him get into the passenger seat of a car. Police pulled the car over, and placed White under arrest for domestic violence. The driver of the vehicle was White's ex-wife. Officers searched the immediate area where they had first observed White on foot. Inside a trash can, the officers recovered a black and white backpack with a fully loaded 9mm handgun. A second fully loaded magazine was in the backpack. The gun was reported stolen from a home invasion in Van Buren Township in January 2012. Also inside the backpack was a gallon-sized Ziploc bag containing 218.9 grams of marijuana. (PSR ¶ 10.)

After White's arrest, officers spoke with his girlfriend. She said that while she and White were arguing, he showed her a small black gun. Before leaving her house, White struck Ms. Lewis in her left eye with his fist, knocking her to the floor. Also present in the home at the time of the assault were four children under the age of 11. (PSR ¶ 9.) White was charged with

4

domestic violence, but his girlfriend eventually decided not to go forward, and the case was dismissed. (PSR ¶ 42.)

In March 2013, White was charged in a federal criminal complaint and an arrest warrant issued. Police looked for White, but could not find him. Finally, in August 2013, officers conducting surveillance saw that White was at his girlfriend's home. Officers approached the door, and White fled out the back and jumped over a fence. Police found 10 baggies of marijuana on White's person, and additional marijuana and crack cocaine in his girlfriend's house. (PSR ¶ 11.)

In April 2014, White pleaded guilty to felon in possession of a firearm and possession with intent to distribute crack cocaine. Based on a criminal history category V, his guideline range was 151 to 188 months. (PSR ¶¶ 76,77.) In July 2014, Judge Battani sentenced White to 120 months in the custody of the Bureau of Prisons.

White is currently incarcerated at Milan FCI. He is 36 years old, and his projected release date is March 18, 2022. His only medical condition is recently diagnosed hypertension, and just this week, he began receiving medication to lower his blood pressure.

White's medical records show that he has been healthy with few medical issues during his period of incarceration. (White's Medical Records,

submitted under seal as Exhibit 1.) In 2016, when he was treated for a sore throat and cough, his blood pressure was 126/86.[1] (Exhibit 1, WHITE_0063.) In 2017, he reported testicular pain, and his blood pressure was 132/87. (*Id.*, WHITE_0095.) On March 8, 2020, White injured his knee playing basketball. (*Id.*, WHITE_0153.) He was sent to the emergency room for an evaluation, and the X-ray showed no fracture. On March 9, 2020, his blood pressure was 116/67. (*Id.,* WHITE_0153.) On March 27, 2020, White was given follow-up care for his knee injury. At this time, his blood pressure was elevated to 144/85 and 151/98. (*Id,* WHITE_0145.). The medical report notes that it was "unclear" if White's elevated blood pressure was pain related. (*Id.*, WHITE_0147). Staff provided White with material about hypertension, and planned to reevaluate him in one month. (*Id.*)  Earlier this week, on May 4, 2020, medical staff treated White, and his blood pressure remained elevated: 139/85 and 153/95. (*Id.*, WHITE_0185.) The doctor gave White a prescription for the blood pressure medication Amlodipine, directing him to take 5 mg by mouth daily to control blood pressure. (*Id.*, WHITE_0186).

---

[1] In general, normal blood pressure is less than 120 over 80, or 120/80.

Although hypertension is treatable with medication, White has moved for compassionate release, citing his hypertension and the Covid-19 pandemic. But he has not exhausted his administrative remedies. White did not submit a request for compassionate release to the warden of his facility. Instead, on April 20, 2020, White's attorney, Wade Fink, sent a letter to the Warden of Milan via U.S. postal service. (R. 39, Exhibit A, PgID 164-165.) Perhaps because U.S. mail delivery has been delayed during the pandemic, or perhaps because compassionate release requests are generally submitted by inmates, and not through legal mail, as of April 30, 2020, Mr. Fink's letter had not reached the warden. On April 30, 2020, undersigned counsel for the government provided BOP counsel with Mr. Fink's letter, and the letter was logged into the BOP system as a compassionate release request.

## Argument

I. **The Bureau of Prisons has responded to Covid-19 by protecting inmates and increasing home confinement.**

### A. The Bureau of Prisons' precautions have mitigated the risk from Covid-19 within its facilities.

The Bureau of Prisons has reacted quickly to confront Covid-19's spread within its facilities. For over almost a decade, the Bureau of Prisons has maintained a detailed protocol for responding for responding to a

pandemic. Consistent with that protocol, the Bureau of Prisons began planning for Covid-19 in January 2020.

On March 13, 2020, the Bureau of Prisons began modifying its operations to implement its Covid-19 Action Plan and minimize the risk of Covid-19 transmission into and inside its facilities. *See* BOP Covid-19 Modified Operations Website. Since then, as the worldwide crisis has evolved, the Bureau of Prisons has repeatedly revised its plan. The current plan, which is in effect until May 18, 2020, requires that inmates in every institution be secured in their assigned cells or quarters for at least 14 days to stop the spread of the disease. Only limited group gathering is allowed, and social distancing is maximized. Staff and inmates are issued face masks to wear in public areas. *See* BOP FAQs: Correcting Myths and Misinformation. And the movement of inmates and detainees between facilities is severely restricted, with exceptions only for medical treatment and similar exigencies.

Every newly admitted inmate is screened for Covid-19 risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are provided with medical evaluation and treatment and are isolated from other inmates until testing negative for Covid-19 or

being cleared by medical staff under the CDC's criteria. In areas with sustained community transmission, all staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone. A staff member with other symptoms can be placed on leave by a medical officer.

Other access to the facilities has likewise been restricted. Contractors are only permitted access if performing essential services, and any contractor who requires access is screened for symptoms and risk factors. Social and legal visits have been suspended to limit the number of people entering the facility and interacting with inmates. But to ensure that relationships and communication are maintained throughout this disruption, the Bureau of Prisons has increased inmates' telephone allowance to 500 minutes per month. Legal visits are permitted on a case-by-case basis after the attorney has been screened for infection.

Like all other institutions, penal and otherwise, the Bureau of Prisons has not been able to eliminate the risks from Covid-19 completely, despite its best efforts. But the Bureau of Prisons' measures will help federal inmates remain protected from Covid-19 and ensure that they receive any required medical care during these difficult times.

In his motion, White argues that Milan is the "sixth most infected BOP facility." (R. 39, PgID 145.) This is no longer true: although Milan FCI initially saw higher numbers than some other BOP facilities, the outbreak at Milan has slowed, and the infection rate is decreasing. As of May 5, 2020, Milan FCI has 14 open Covid-19 cases; 53 other inmates have tested positive but recovered. This means that Milan is now 18th on the list of BOP facilities with coronavirus cases. The preventative measures taken by BOP are having a significant impact on the infection rate at Milan FCI.

### B.    The Bureau of Prisons is increasing the number of inmates who are granted home confinement.

The Bureau of Prisons has also responded to Covid-19 by increasing the placement of federal prisoners in home confinement. New legislation now temporarily permits the Bureau of Prisons to "lengthen the maximum amount of time for which [it] is authorized to place a prisoner in home confinement" during the Covid-19 pandemic. Coronavirus Aid, Relief, and Economic Security Act (CARES Act) § 12003(b)(2), Pub. L. No. 116-136, 134 Stat. 281, 516 (Mar. 27, 2020). The Attorney General has also issued two directives, ordering the Bureau of Prisons to use the "various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing Covid-19 pandemic." (03-26-2020 Directive to

BOP, at 1; *accord* 04-03-2020 Directive to BOP, at 1). The directives require the Bureau of Prisons to identify the inmates most at risk from Covid-19 and "to consider the totality of circumstances for each individual inmate" in deciding whether home confinement is appropriate. (03-26-2020 Directive to BOP, at 1).

The Bureau of Prisons' efforts on this point are not hypothetical. Over 2144 federal inmates have been granted home confinement since the Covid-19 pandemic began, and that number increases every day. BOP Coronavirus FAQs. As the Attorney General's directives have explained, these home-confinement decisions have required evaluating several criteria: (1) each inmate's age and vulnerability to Covid-19; (2) whether home confinement would increase or decrease the inmate's risk of contracting Covid-19; and (3) whether the inmate's release into home confinement would risk public safety. (03-26-2020 Directive to BOP; 04-03-2020 Directive to BOP).

These criteria not only make sense, but also fit the realities of the Covid-19 pandemic far better than any other solution does. The Bureau of Prisons cannot open its facilities' gates indiscriminately and unleash tens of thousands of convicted criminals, en masse. It must focus on the inmates who have the highest risk factors for Covid-19 and are least likely to engage

11

in new criminal activity. This is true not just to protect the public generally, but to avoid the risk that a released defendant will bring Covid-19 back into the jail or prison system if he violates his terms of release or is caught committing a new crime. See 18 U.S.C. § 3624(g)(5); 34 U.S.C. § 60541(g)(2).

The Bureau of Prisons must also balance another important consideration: how likely is an inmate to abide by the CDC's social-distancing protocols or other Covid-19-based restrictions on release? Many inmates—particularly those who have been convicted of serious offenses or have a lengthy criminal record—have previously proven unwilling to abide by society's most basic norms. And if a prisoner would be unlikely to take any Covid-19 restrictions seriously, he would also be far more likely than the general public to contract and spread Covid-19 if released.

The Bureau of Prisons also must account for the current strain on society's first responders. Police departments in many cities have stretched to their limits as officers have either contracted Covid-19 or been placed in quarantine. Some cities, including Detroit, have seen spikes in shootings and murders. Child sex predators have taken advantage of bored school-aged kids spending more time online. Covid-19-based fraud schemes have proliferated. There are real risks to public safety, and those risks will only increase if communities are faced with a sudden influx of prisoners.

12

Finally, the Bureau of Prisons' home-confinement initiative allows it to marshal and prioritize its limited resources for the inmates and circumstances that are most urgent. For any inmate who is a candidate for home confinement, the Bureau of Prisons must first ensure that his proposed home-confinement location is suitable for release, does not place him at an even greater risk of contracting Covid-19, and does not place members of the public at risk from him. It must assess components of the release plan, including whether the inmate will have access to health care and other resources. It must consider myriad other factors, including the probation department's dramatically reduced ability to assist and supervise inmates who have been released.

Those types of system-wide resource-allocation decisions are difficult even in normal circumstances. That is why Congress tasked the Bureau of Prisons to make them and has not subjected the decisions to judicial review. 18 U.S.C. § 3621(b) ("Notwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court."); *United States v. Patino,* No. 18- 20451, 2020 WL 1676766, at *6 (E.D. Mich. Apr. 6, 2020) ("[A]s a general rule, the Court lacks authority to direct the operations of the Bureau of Prisons."). It is

especially true now, given the Bureau of Prisons' substantial and ongoing efforts to address the Covid-19 pandemic.

## II.   **The Court should deny White's motion for compassionate release.**

White's motion for a reduced sentence should be denied. A district court has "no inherent authority . . . to modify an otherwise valid sentence." *United States v. Washington*, 584 F.3d 693, 700 (6th Cir. 2009). Quite the contrary: a district court's authority to modify a defendant's sentence is "narrowly circumscribed." *United States v. Houston*, 529 F.3d 743, 753 n.2 (6th Cir. 2008). Absent a specific statutory exception, a district court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c). Those statutory exceptions are narrow. *United States v. Ross*, 245 F.3d 577, 586 (6th Cir. 2001). Compassionate release under 18 U.S.C. § 3582(c)(1)(A) is equally narrow.

*First*, compassionate release requires exhaustion. If a defendant moves for compassionate release, the district court may not act on the motion unless the defendant files it "*after*" either completing the administrative process within the Bureau of Prisons or waiting 30 days from when the warden at his facility received his request. 18 U.S.C. § 3582(c)(1)(A); *United States v. Raia*, 954 F.3d 594, 595–96 (3d Cir. 2020).

14

Because this requirement is a statutory one and not judicially crafted, it is mandatory. *Ross v. Blake*, 136 S. Ct. 1850, 1856–57 (2016); *Island Creek Coal Co. v. Bryan*, 937 F.3d 738, 751 (6th Cir. 2019).

*Second*, even if a defendant exhausts, he must show "extraordinary and compelling reasons" for compassionate release, § 3582(c)(1)(A), and release must be "consistent with" the Sentencing Commission's policy statements. As with the identical language in § 3582(c)(2), compliance with the policy statements incorporated by § 3582(c)(1)(A) is mandatory. *See Dillon v. United States*, 560 U.S. 817 (2010); *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014). To qualify, a defendant must have a medical condition, age-related issue, family circumstance, or other reason that satisfies the criteria in USSG § 1B1.13(1)(A) & cmt. n.1, and he must "not [be] a danger to the safety of any other person or to the community," USSG § 1B1.13(2).

*Third*, even if a defendant is eligible for compassionate release, the district court may not grant the motion unless the factors in 18 U.S.C. § 3553(a) support release. 18 U.S.C. § 3582(c)(1)(A); USSG § 1B1.13.

A. **The Court is barred from granting release because White has not exhausted his administrative remedies.**

15

The Court must dismiss White's motion, because he has not satisfied the exhaustion requirement for compassionate release under 18 U.S.C. § 3582(c)(1)(A). Until recently, only the Bureau of Prisons could move for compassionate release. The First Step Act of 2018 amended the statute, permitting defendants to move for it too. First Step Act § 603(b), Pub. L. No. 115-319, 132 Stat. 5194, 5239 (Dec. 21, 2018).

But the provision permitting a defendant-initiated motion includes an exhaustion requirement. *Id*. A district court may not grant a defendant's motion for compassionate release unless the defendant files it "after" the earlier of (1) the defendant "fully exhaust[ing] all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" or (2) "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility." 18 U.S.C. § 3582(c)(1)(A); *United States v. Raia*, 954 F.3d 594, 595 (3d Cir. 2020).

Statutory exhaustion requirements, like the one in § 3582(c)(1)(A), are mandatory. *Ross v. Blake*, 136 S. Ct. 1850, 1856–57 (2016). As the Sixth Circuit has explained, there is a "sharp divide" that "separates statutory from prudential exhaustion." *Island Creek Coal Co. v. Bryan*, 937 F.3d 738, 751 (6th Cir. 2019). Unlike judicially crafted requirements, statutory

requirements may not be excused, even to account for "special circumstances." *Ross,* 136 S. Ct. at 1856–57.

Section 3582(c)(1)(A) is likely even a *jurisdictional* bar on the Court's authority to consider a motion for compassionate release. The Sixth Circuit has labeled § 3582(c)'s limitations "jurisdiction[al]." *Williams*, 607 F.3d at 1125. The statute "speak[s] to the power of the court rather than to the rights or obligations of the parties." *Landgraf v. USI Film Prods.,* 511 U.S. 244, 274 (1994). And it delineates "when, and under what conditions," a court may exercise its "'adjudicatory authority.'" *Bowles v. Russell*, 551 U.S. 205, 212–13 (2007) (quoting *Eberhart v. United States*, 546 U.S. 12, 16 (2005)). But even if § 3582(c) requirements were not considered truly jurisdictional, they would still be mandatory claim-processing rules that must be enforced when a party "properly rais[es]" them. *Eberhart*, 546 U.S. at 19 (2005). Thus, regardless of how it is labeled, § 3582(c)(1)(A)'s exhaustion requirement is mandatory. See *Ross*, 136 S. Ct. at 1856–57; *United States v. Marshall*, 954 F.3d 823, 826–29 (6th Cir. 2020).

The only court of appeals to address this question has agreed. In *United States v. Raia*, 954 F.3d 594, 595–97 (3d Cir. 2020), the Third Circuit held that the Covid-19 pandemic does not permit inmates or district judges to bypass § 3582(c)(1)(A)'s exhaustion requirement. Rather, "[g]iven BOP's

17

shared desire for a safe and healthy prison environment, . . . strict compliance with § 3582(c)(1)(A)'s exhaustion requirement takes on added— and critical—importance." *Id.* at 597.

The majority of district courts to decide this question nationwide, including many in our district, have similarly held that a "failure to exhaust" under § 3582(c)(1)(A) "cannot be excused, even in light of the Covid-19 pandemic." *United States v. Alam*, No. 15-20351, 2020 WL 1703881, at *2–*3 (E.D. Mich. Apr. 8, 2020); *accord United States v. Shah*, No. 16-20457, 2020 WL 1934930, at *2 (E.D. Mich. Apr. 22, 2020); *United States v. Mathews*, No. 14-CR-20427-02, 2020 WL 1873360, at *2–*3 (E.D. Mich. Apr. 15, 2020). As one of the those decisions has explained, the few courts that have excused exhaustion under § 3582(c)(1)(A) have mistakenly relied on cases addressing judge-made exhaustion requirements, not statutory exhaustion requirements. *Mathews*, 2020 WL 1873360, at *2–*3.

Congress's reasons for § 3582(c)(1)(A)'s exhaustion requirement apply with even greater force during the Covid-19 pandemic. The Bureau of Prisons is already responding to the pandemic—not just through heightened safety measures, but by evaluating its entire prison population for home confinement. By requiring a defendant to exhaust, § 3582(c)(1)(A) gives the Bureau of Prisons the opportunity to gather an inmate's medical

18

documentation and other records, evaluate his request, and decide in the first instance whether it justifies either compassionate release or some other form of relief. As the Third Circuit observed: "Given BOP's shared desire for a safe and healthy prison environment, . . . strict compliance with § 3582(c)(1)(A)'s exhaustion requirement takes on added—and critical— importance." *Raia*, 954 F.3d at 597.

White did not exhaust his administrative remedies. On April 20, 2020, White's lawyer sent a letter, via the postal service, to Milan. (R. 39, Ex. A.) On April 29, 2020, White's lawyer filed the instant motion. (R. 39.) In response to the motion, counsel for the government contacted BOP counsel via email, and provided a copy of Exhibit A. BOP counsel responded that as of April 30, 2020, BOP had not received Exhibit A. BOP counsel further stated that Exhibit A would be treated as a compassionate release request received on April 30.

White did not file his motion after completing the administrative process within the Bureau of Prisons or waiting 30 days. Accordingly, he has not satisfied § 3582(c)(1)(A)'s mandatory exhaustion requirement.

**B.    There are no extraordinary and compelling reasons to grant White compassionate release.**

Even if White had exhausted his administrative remedies, compassionate release would be improper. Compassionate release must be "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). Congress tasked the Sentencing Commission with "describe[ing] what should be considered extraordinary and compelling reasons for [a] sentence reduction" under § 3582(c)(1)(A), as well developing "the criteria to be applied and a list of specific examples" for when release is permitted. 28 U.S.C. § 994(t).

Because the Sentencing Commission has fulfilled Congress's directive in USSG § 1B1.13, that policy statement is mandatory. Section 3582(c)(1)(A)'s reliance on the Sentencing Commission's policy statements mirrors the language governing sentence reductions under 18 U.S.C. § 3582(c)(2) for retroactive guideline amendments. *Compare* § 3582(c)(1)(A) *with* § 3582(c)(2). When Congress uses the same language in the same statute, it must be interpreted in the same way. *Marshall*, 954 F.3d at 830. In both contexts, then, the Sentencing Commission's restraints "on a district court's sentence-reduction authority [are] absolute." *United States*

*v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014); *accord Dillon v. United States*, 560 U.S. 817, 830 (2010).

The First Step Act did not change that. It amended only *who* could move for compassionate release under § 3582(c)(1)(A). It did not amend the substantive requirements for release. *United States v. Saldana*, No. 19-7057, 2020 WL 1486892, at *2–*3 (10th Cir. Mar. 26, 2020); *United States v. Mollica*, No. 2:14-CR-329, 2020 WL 1914956, at *4 (N.D. Ala. Apr. 20, 2020). Section 1B1.13 remains binding.

Section 1B1.13 cabins compassionate release to a narrow group of defendants who are most in need. That policy statement limits "extraordinary and compelling reasons" to four categories: (1) the inmate's medical condition; (2) the inmate's age; (3) the inmate's family circumstances; and (4) other reasons "[a]s determined by the Director of the Bureau of Prisons," which the Bureau of Prisons has set forth in Program Statement 5050.50. USSG § 1B1.13 cmt. n.1. As the Tenth Circuit recently explained, a district court "lack[s] jurisdiction" to grant compassionate release when a defendant's circumstances do not fall within those categories. *Saldana*, 2020 WL 1486892, at *3.

In support of his motion for compassionate release, White asserts that his recently diagnosed hypertension makes him especially vulnerable to

complications from Covid-19. But White is not eligible for compassionate release on this basis. While "extraordinary and compelling reasons" can include a defendant's medical condition, to qualify, the condition must be "a terminal illness," or "a serious physical or medical condition." *Id.*, n. 1, (A)(i), (ii). Hypertension, especially when treated with medication, is not a serious physical or medical condition.

Nor is White correct in suggesting that the Covid-19 pandemic should alter this analysis here. Even assuming, in other cases, that a defendant's risk from Covid-19 might make the difference in his eligibility for release under § 1B1.13, White's circumstances do not satisfy that standard. High blood pressure like White's is commonly managed through medication. Although there was initially some concern among medical scholars about the interaction between blood pressure medications and Covid-19, a recent study published in *The New England Journal of Medicine* reached a reassuring conclusion: there is no association between common blood pressure drugs and the risk from Covid-19.[2] Nor is hypertension a proven risk factor for Covid-19 complications. Although doctors have noticed a

---

[2] Harmony R. Reynolds, M.D.,  et al, Renin–Angiotensin–Aldosterone System Inhibitors and Risk of Covid-19, New England J. of Medicine (May 1, 2020).

correlation between hypertension and Covid-19 complications, the association is likely not casual. A recent study noted that because hypertension is common among the elderly, and because older people are at particular risk from Covid-19, there may be no link between hypertension and severe forms of Covid-19 complications.[3] At most, the connection between high blood pressure and Covid complications is unknown. White's medical issues are simply not among the most serious.

Nor does the Covid-19 pandemic by itself qualify as the type of inmate-specific reason permitting compassionate release. As the Third Circuit explained, "the mere existence of Covid-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." *Raia*, 954 F.3d at 597. The Bureau of Prisons has worked diligently to implement precautionary measures reducing the risk from Covid-19 to White and other inmates. Nothing in the statute or USSG § 1B1.13 supports the unbounded interpretation of § 3582(c)(1)(A) that he now asks this Court to adopt. *See Raia*, 954 F.3d at 597.

---

[3] "Discussing COVID-19 and Hypertension," Medical News Today.

White is also ineligible for compassionate release for another reason. Section 1B1.13(2) only permits release if a defendant is "not a danger to the safety of any other person or to the community." White has a lengthy criminal history that spans his entire adult life. He has several juvenile convictions. (PSR ¶ 55.) His adult convictions begin at age 17, when he broke into a car dealership. (PSR § 31.) He was sentenced to a term of probation, which he violated twice. At age 18, after he was arrested for dealing drugs, he told police he was selling drugs to support his mother and sister. (PSR ¶ 32.) White's mother told police that he was lying, and that he provided no financial support for his family. Again, he received a sentence of probation, which he violated. When he was 19, White fled from the police in his car and nearly hit two other vehicle. (PSR ¶ 35.) White was convicted of uttering and publishing in 2002. (PSR ¶ 36.) White was in custody from 2003 to June 2007. Less than two years later, in January 2009, White was arrested after police found a stolen gun in his glovebox. (PSR ¶ 38.) He was convicted of carrying a concealed weapon and sentenced to 16 months to 10 years in custody. White was released on parole in March 2011. Less than two years later, on January 12, 2013, a traffic stop of Defendant revealed marijuana and $1,800 in cash. (PSR ¶¶ 39, 43.) The instant offense—the domestic assault of Ms. Lewis and possession of a firearm—occurred on

January 29, 2013. When Defendant was finally arrested in August 2013, he was in possession of additional controlled substances (marijuana and crack cocaine). His criminal activity has been continuous and unabated.

White is not eligible for compassionate release.

## C. The factors in 18 U.S.C. § 3553(a) strongly weigh against compassionate release.

Even when an inmate is statutorily eligible for a sentence modification based on "extraordinary and compelling reasons," compassionate release is not necessarily appropriate. Before ordering relief, the Court must consider the factors set forth in 18 U.S.C. § 3553(a) and determine that release is still appropriate. So even if the Court were to find White eligible for compassionate release, the § 3553(a) factors, including White's history and characteristics, seriousness of the offense, promoting respect for the law, and providing just punishment, should still disqualify him.

## III. If the Court were to grant White's motion, it should order a 14-day quarantine before release.

If the Court were inclined to grant White's motion despite the government's arguments above, the Court should order that he be subjected to a 14-day quarantine before release.

## Conclusion

White's motion should be denied.

<div style="margin-left: 50%;">

Respectfully submitted,

MATTHEW SCHNEIDER
United States Attorney

<u>/s Sara D. Woodward</u>
Assistant United States Attorney
211 West Fort Street, Suite 2001
Detroit, Michigan  48226-3211
(313) 226-9180
sara.woodward@usdoj.gov

</div>

May 7, 2020

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 7, 2020, I electronically filed the foregoing document with the Clerk of the Court using the ECF system which will send notification of such filing to counsel of record.

/s/ Sara D. Woodward
Assistant United States Attorney
211 West Fort Street, Suite 2001
Detroit, Michigan  48226-3211
(313) 226-9810
sara.woodward@usdoj.gov

Date: May 7, 2020